UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

vs.                                                    REPORT AND RECOMMENDATION

Jorge Prado Montano, a/k/a
Alfredo Gonzalez, and David
Jimenez, a/k/a David Jimenez
Delamora a/k/a David Noe,

        Defendants.               Crim. No. 05-110(01-02)(JRT/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Jorge Prado Montano ("Montano"), and of the Defendant David Jimenez ("Jimenez"):

    1.    The Defendants' Motions to Suppress Statements, Admissions and Answers.

    2.    The Defendants' Motions to Suppress Evidence Obtained by Search and Seizure.

A Hearing on the Motions was conducted on May 18, 2005, at which time, the Montano appeared personally, and by Andrew H. Mohring, Assistant Federal Defender; Jimenez appeared personally, and by Thomas C. Plunkett, Esq.; and the Government appeared by Elizabeth C. Peterson, Assistant United States Attorney. For reasons which follow, we recommend that the Motions to Suppress Statements, Admissions and Answers be granted, in part, and that the Motions to Suppress Evidence Obtained by Search and Seizure be denied.[1]

## II. Factual Background

The Defendants are each charged with one Count of Conspiracy to distribute, and to possess with intent to distribute, in excess of fifty (50) grams of methamphetamine, a controlled substance, in violation of Title 18 U.S.C. §2, and Title 21 U.S.C. §§841(a)(1), 841(b)(1)(A), and 846, as well as with one Count of Aiding and Abetting Possession with Intent to Distribute Methamphetamine, in violation of Title 18 U.S.C. §2, and Title 21 U.S.C. §§841(a)(1), and 841(b)(1)(A). The alleged

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendants' Motions to Suppress. Leave was granted, and the last submission on the issues was received on May 31, 2005, at which time, the Motions were taken under advisement. See, Title 18 U.S.C. §3161(h) (1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 767-77 (8th Cir. 1995).

violations are said to have occurred on or about March 3, 2005, in this State and District.   As pertinent to those charges, and to the Motions pending before us, the operative facts may be briefly summarized.[2]

Jason Steinert ("Steinert"), who has been employed as a Trooper with the Minnesota State Patrol for six (6) years, testified at the Hearing on the Motions.   In addition, Steinert has worked as a Deputy Sheriff in Todd County, and as a police officer with the City of Bloomington, and he has a total of twelve (12) years of experience in law enforcement.   Steinert testified to his extensive experience in making traffic stops, and to his experience in conducting drug investigations, arising from both classroom, and on-the-job training.

On March 3, 2005, at approximately 9:35 o'clock a.m., Steinert came upon a stalled vehicle on the right-hand shoulder, which had been traveling eastbound on

---

[2]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."   As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.   Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent devel-opment of the facts and law may require.   See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

Interstate 94, between Sauk Center and Melrose, Minnesota.  Since it was part of his job, Steinert activated his lights[3] to check on the stalled vehicle, which he described as a small S-10 pickup truck, with Washington license plates.  Two men exited the vehicle.  The individual who exited from the driver's side of the truck identified himself as Alfredo Gonzalez ("Gonzalez"), while the individual who exited from the passenger side of the vehicle identified himself as "Noe."  Those individuals have subsequently been identified, respectively, as Montano and Jimenez.[4]  Steinert testified that, as the two men started walking toward his patrol car, he exited his vehicle, and met them half-way.  The men informed Steinert that they had run out of fuel, and that the battery on their cell phone was dead.

Steinert asked the individuals for identification, but neither of the men was able to produce any form of identification.  When Steinert asked Montano for a driver's license, Montano replied that he was not driving, but that he thought he had

_____

[3]By activating his lights, the camera and audiotape in his squad car were simultaneously activated, and remained on through the entirety of the traffic stop, even though, at some point in time, Steinert shut off his front lights, and left only the rear lights activated.

[4]Although Jimenez exited from the passenger side of the vehicle, Steinert testified that he was informed, by at least one of the men, that Jimenez had been driving.

identification in the truck.  Montano walked back to the truck, followed by Steinert, and entered through the driver's side door.  Steinert, who was standing directly over Montano's right shoulder, noted that Montano did not look in the glove compartment, or in the center console, as most people would do, and it appeared to him that Montano was not searching for identification at all, although he did rifle through some papers on the floor of the vehicle for several seconds.  Rather, Montano appeared to be more concerned with where Steinert was looking.  Montano then came back out of the vehicle, and informed Steinert that he did not have any identification.  Steinert testified that Montano appeared to be nervous.

Jimenez told Steinert that the vehicle belonged to his brother, and that they had traveled to Minnesota to sell the truck.  Steinert reiterated that neither of the men had identification, and the vehicle was not registered to them.[5]  In addition, Steinert became suspicious because the vehicle had only fast food wrappers in it, with no luggage being

---

[5]On cross-examination, Steinert was asked whether there was anything to indicate that the registration of the vehicle was invalid, to which he replied in the affirmative, and explained that the title had not been properly gone through, because the second half had not been completed.  However, Steinert also stated that his checks did not reveal the vehicle to have been stolen, and that nothing in the title, or ownership of the vehicle, justified its seizure.  In addition, Steinert testified that he did not suspect the individuals of being intoxicated, nor did he detect the smell of alcohol, or marijuana.

visible, despite the fact that the men had stated that they had come from Washington. Jimenez also attempted to look for identification in the truck.  Steinert followed him to the passenger side of the vehicle but, as had been the case  with Montano, Jimenez did not appear to make any direct attempt to locate his identification, by looking in the glove compartment or the center console.   Instead, Jimenez was looking over his shoulder at Steinert, after which he said that he could not find his identification.

Steinert told the men that they had to have some type of identification, and Montano produced a photocopy of a California driver's license, with Gonzalez's name on it,[6] and the physical description on the driver's license matched that of Montano. Steinert instructed Montano to have a seat in the pickup truck, and he asked Jimenez to get into the squad car.  Steinert testified that, at that point in time, the Defendants were not free to go, and he had not advised them of their <u>Miranda</u>[7] rights, because he

---

[6]At some point, Steinert ran the license, and determined that the license number was registered to a different person, and that there was no California driver's license for Alfredo Gonzalez.   Steinert testified that he printed out the information at approximately 6:00 o'clock p.m. that night, but that he learned those facts earlier in the day, while he was at the traffic stop of the pickup truck, and after the Defendants had been separated.

[7]See, <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).

was simply asking the men general questions, in order to ascertain their identities, particularly since he never obtained a consistent story from them.

Prior to having Jimenez enter the squad car, Steinert patted him down, and discovered a lighter, and a ticket, from Washington, with a different name than he had been given. Jimenez told Steinert that he was taking care of it for a friend. Steinert asked Jimenez general questions -- such as, how he spelled his last name, where he was coming from, where he was going, and how long he had known Montano. Steinert testified that his purpose in doing so was to obtain one story. In response to Steinert's questions, Jimenez told him that he had known Montano either for one to two years, or for a month.[8] Jimenez also stated that he had received traffic tickets in the past, and that they should be on his record. However, when Steinert ran his name, and had the dispatcher run his name, it came back not on file. Further, although Jimenez had the title to the vehicle in his possession, it did not list either Jimenez, or Montano, as the registered owner. Later, Steinert asked Montano questions similar to those he had asked of Jimenez, and Montano gave inconsistent answers.

---

[8]Steinert testified that one of the men said that he had known the other for one to two years, and that the other man gave the answer of one month, but he could not recall who had given which answer.

Since neither of the men had drivers' licenses, and there was no proof of ownership of the vehicle, or insurance coverage cards, Steinert believed that he was being provided with false information, and false names.[9]  As a result, he radioed dispatch to have more officers respond, and he continued to try to verify the mens' identities.  When the other officers arrived, Montano was also placed in a patrol car, while the officers' investigative efforts continued.  In addition, in the absence of drivers' licenses from either of the two men, the officers decided to tow the vehicle, and to conduct an inventory search of it.  Steinert testified that the policy is to tow vehicles, when a custodial arrest has been made, and that the bases for arresting Montano and Jimenez were the provision of false identification, the lack of valid drivers' licenses, and the absence of insurance cards on the vehicle.[10]  In conjunction

_____

[9]On cross-examination, Steinert was asked whether there was any indication that Jimenez had provided a false name, other than the fact that Steinert could not determine who he was.  Steinert replied that his name did not come back on file, and that he had a citation, in his possession, that was not in his name.

[10]Steinert identified Government Exhibit 1 as the policy that was followed anytime that a vehicle was towed.  During voir dire of the witness, Steinert testified that the subject of the form was a "Custody Report," and that the purpose was to establish a uniform procedure in using the form.  See, Government Exh. 1.  Further, Steinert testified that the policy instructed officers how to fill out the form, as well as under what circumstances the form should be completed.  He acknowledged, however, that the policy does not address locked containers, nor does it tell an officer how to

(continued...)

with their decision to have the vehicle towed, the officers decided to conduct an inventory search, because they were unable to release the vehicle to either of the occupants, since neither of them had a valid driver's license, nor could they prove that they were licensed drivers.   Additionally, Steinert testified that the officers are responsible for the vehicle, and its contents, and that an inventory search also protects the occupants as well, because some occupants might have expensive property in the vehicle.   Steinert also stated that the decision to search the vehicle was incident to the arrest of the Defendants, and that neither a Search Warrant, nor consent to search had been obtained.

Steinert and his Sergeant began the inventory search, in accordance with the policy, noted the items that were present, and completed the form.   The Sergeant noticed that the vehicle's stereo radio was not securely fastened to the dash and, when he picked it up, he found a pistol.   Behind the driver's seat, Steinert found what appeared to be a can of Rave hair spray, with a false bottom.   Inside of the container, Steinert discovered drug paraphernalia, and a white crystal substance, which he

---

[10](...continued)
perform an inventory search.   Over Jimenez's objection, we received Government Exhibit 1 into evidence.

suspected to be methamphetamine -- based on his experience -- and which later field-tested positive for that substance.  Steinert testified that he did not ask Montano about any of the items that were found, nor did Montano make any statements about those items.

The officers called for a canine unit, and the canine indicated at specific locations on the vehicle -- namely, by the spare tire, and by the dashboard.[11]  Steinert, and another officer, transported the Defendants to the Stearns County Jail, while his Sergeant, and a different officer, accompanied the vehicle back to the impound lot, in order to conduct a further investigation.  Steinert testified that the search was continued, because the officers believed that there was still contraband in the vehicle,

---

[11]It appears as though Steinert might have called for the canine earlier, in light of the fact that the canine unit was forty (40) to forty-five (45) minutes away but, at that time, Steinert had not made a concrete decision to use the canine.

Although Steinert has been involved in cases where canine sniffs have been performed, he has not personally worked with drug dogs before, nor is he trained as a canine handler.  Steinert further testified that he had not reviewed the report of the canine handler, which stated that the dog had not alerted to any one portion of the vehicle, but that there were good indicators.  However, Steinert testified that the handler told him that the dog alerted.  Steinert acknowledged that he did not know the difference between an "alert," and an "indication."  The Defendants jointly moved the admission of the canine handler's report, which was admitted over the Government's objection.  See, Joint Defense Exhibit A.

- 10 -

but that the freeway was not a safe location to search the vehicle, and they did not have any tools to take apart the dashboard. During the subsequent search, the officers recovered a quantity of drugs behind the dashboard.

Jeffrey K. Sharp ("Sharp"), who is a Minnesota State Patrol Officer assigned to the Drug Enforcement Agency ("DEA") as a Task Force Officer, also testified. Sharp stated that he has been in law enforcement for twelve (12) years, and that he sometimes takes statements from individuals, for which he has received training, and attended a seminar. After Steinert discovered the large quantity of drugs, Sharp took control of the case for Federal prosecution.

On March 3, 2005, at approximately 8:00 o'clock p.m., Sharp traveled to the Stearns County Jail to interview Jimenez, who was in custody. Sharp, who was in plain clothes and was not armed, met with Jimenez in a small interview room, in the holding area, where they sat a few feet apart, at a table. When Jimenez entered the room, Sharp shook his hand, welcomed him, identified himself by showing his identification, and exchanged pleasantries. Based on that interaction, Sharp determined that Jimenez did not need an interpreter.[12] Sharp administered the <u>Miranda</u>

_____

[12]Sharp likewise determined that Montano did not need an interpreter, when he
(continued...)

warning to Jimenez from memory,[13] and made sure that he understood each individual right, before continuing.  Sharp believed that Jimenez understood his rights, and chose to waive them.  During the interview, Jimenez did not appear to be under the influence of drugs, or alcohol, nor did he appear to have any mental condition, and his responses were coherent.  Sharp did not make any threats or promises and, after approximately fifteen minutes, the interview terminated, when Jimenez told Sharp that he did not want to answer any more questions.  During the course of the interview, Jimenez never asked for an attorney.

At approximately 8:10 o'clock p.m., Sharp met with Montano in the same interview room, and administered his <u>Miranda</u> rights from memory.  Montano appeared to understand his rights, which he waived.  Sharp did not recall talking specifically about the charges, or about the possible penalties Montano could face, but he did explain, to each Defendant, that the decision had been made to handle the case federally, because of the amount of drugs, which was why the DEA was present.

--------

[12](...continued)
interviewed Montano.

[13]Sharp testified that he has administered the <u>Miranda</u> warning numerous times, and he had no concern that he missed any of the rights.  He further explained that he did not have any forms, because he traveled from his home to conduct the interviews.

Sharp also told Montano that his cooperation would be communicated to the prosecution. During the interview, Montano did not appear to be under the influence of drugs, or alcohol, nor did he appear to have any mental condition, and he was cooperative. Sharp did not make any threats or promises, and Montano did not ask for an attorney, or state that he did not want to answer any more questions. After approximately thirty (30) to forty (40) minutes, Sharp completed his questioning, and the interview terminated. Sharp testified that he believed that Montano was being truthful, for the most part, and that he was the more truthful of the two men. He did not interview Montano again after that date. Neither interview was tape-recorded, because such recording is not required in a Federal investigation and, although Sharp took notes, he did not know if they had been preserved.

### III.  Discussion

A.   The Defendants' Motions to Suppress Statements, Admissions and Answers.

1.   Standard of Review. Government agents are not required to administer Miranda warnings to everyone whom they question. See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise

deprived of his freedom of action in any significant way.'"  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984).

Whether an accused was subjected to custodial interrogation is to be determined from the totality of the circumstances.  See,  United States v. Hanson, 237 F.3d 961, 963 (8th Cir. 2001); California v. Beheler, 463 U.S. 1121, 1125 (1983).  In determining whether a suspect is "in custody," we examine whether the extent of the physical or psychological restraints, which were imposed upon the Defendant, during an interrogation by law enforcement, would have been understood by a "reasonable person in the [Defendant's] position" as being consonant with the condition of being in custody.  Berkemer v. McCarty, supra at 442;  United States v. Cates, 251 F.3d 1164, 1166 (8th Cir. 2001); United States v. Carter, 884 F.2d 368, 370 (8th Cir. 1989).  As the Court in United States v. Griffin, 922 F.2d 1343, 1357 (8th Cir. 1990), stated: "If [the Defendant] believed his freedom of action had been curtailed to a 'degree associated with formal arrest,' and that belief was reasonable from an objective viewpoint, then [the Defendant] was being held in custody during the interrogation."

See also, <u>Stansbury v. California</u>, supra at 1529; <u>United States v. Chamberlain</u>, 163

F.3d 499, 503 (8th Cir. 1998).

Under the law of this Circuit, the relevant factors to be considered in making a

determination of custody include an accused's freedom to leave the scene, and the

purpose, place and length of the interrogation.  See <u>United States v. Griffin</u>, supra at

1349.  The most comprehensive list of factors -- although admittedly not exhaustive --

was enumerated, as follows, in <u>United States v. Griffin</u>, supra at 1349:

> [The] inquiry into the indicia of custody has generally
> focused on an examination of (1) whether the suspect was
> informed at the time of questioning that the questioning was
> voluntary, that the suspect was free to leave or request the
> officers to do so, or that the suspect was not considered
> under arrest; (2) whether the suspect possessed
> unrestrained freedom of movement during questioning; (3)
> whether the suspect initiated contact with authorities or
> voluntarily acquiesced to official requests to respond to
> questions; (4) whether strong arm tactics or deceptive
> stratagems were employed during questioning; (5) whether
> the atmosphere of the questioning was police dominated;
> or, (6) whether the suspect was placed under arrest at the
> termination of the questioning.

The Court has regarded the first three of the <u>Griffin</u> factors as mitigative in their effect

upon the ultimate determination, for the presence, during questioning, of one or more

of those factors would tend to weigh against a finding of custody.  On the other hand,

the remaining three factors have been characterized as coercive in their effect, since those factors would tend to accentuate the existence of custody.   A "finding of custody does not, however, have to be supported by all six factors."   United States v. Galceran, 301 F.3d 927, 930 (8th Cir. 2002), citing United States v. Griffin, supra at 1349; see also, United States v. McKinney, 88 F.3d 551, 554 (8th Cir. 1996).

Even if a Miranda warning is required or given, the rights evidenced by the warning can be waived, although "[t]he right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'"   Davis v. United States, supra at 458, quoting Edwards v. Arizona, 451 U.S. 477, 483 (1981). Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him."   Id., citing North Carolina v. Butler, 441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994).  With respect to the validity of a waiver, our Court of Appeals has explained:

> "The inquiry [into the validity of a waiver] has two distinct dimensions * * *. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been

made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.   Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

United States v. Jones, supra at 1313, quoting Moran v. Burbine, 475 U.S. 412, 421 (1986), in turn quoting Fare v. Michael C., 442 U.S. 707, 729 (1979); see also, United States v. Boyd, 180 F.3d 967, 977 (8th Cir. 1999).

In reviewing the "totality of the circumstances," the Court should look to, among other factors, "the background, experience, and conduct of the accused."   United States v. Barahona, 990 F.2d 412, 418 (8th Cir. 1993); see also, United States v. Boyd, supra at 977.   The burden rests with the Government to prove, by a preponderance of the evidence, that the Defendant knowingly and voluntarily waived his Miranda rights. See, Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Barahona, supra at 418; United States v. Dougherty, 810 F.2d 763, 773 (8th Cir. 1987).

Further, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination.   See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000).   For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a

- 17 -

confession."   <u>Dickerson v. United States</u>, supra at 434, citing <u>Schneckloth v.</u>

<u>Bustamonte</u>, 412 U.S. 218, 226 (1973).

>As the Supreme Court has recently explained:

>>The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.]  See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").  The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing."  Stein v. New York, [346 U.S. 156, 185] (1953).

<u>Id.</u> at 434.

Among the circumstances, which are to be considered in this analysis are, first and

foremost, whether a <u>Miranda</u> warning has been given, see, <u>Withrow v. Williams</u>, 507

U.S. 680, 693 (1993); any elements of "police coercion," see, <u>Colorado v. Connelly</u>,

479 U.S. 157, 167 (1986); the length of the interrogation, see, <u>Ashcraft v. Tennessee</u>,

322 U.S. 143, 153-154 (1944); the location of the interrogation, see, <u>Reck v. Pate</u>, 367

U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, <u>Leyra v.</u>

Denno, 347 U.S. 556, 561 (1954).  See also, Withrow v. Williams, supra at 693 (listing the applicable considerations).

2.     Legal Analysis.  The Defendants argue that they were subjected to a custodial interrogation, at the site of the traffic stop, without the benefit of a Miranda warning.  Further, the Defendants contend that their subsequent statements to Sharp should be suppressed, because there was not an effective advice of rights process.

a.     The Defendants' Statements to Steinert.   Notably, the interaction between Steinert and the Defendants was not initiated as the result of a traffic stop, or a Terry investigative stop.  Rather, upon observing a stalled vehicle at the side of the Interstate, Steinert stopped his vehicle, in order to provide assistance. From this, we can reasonably infer that Steinert activated his lights, not as a show of authority, but instead, as a warning to approaching motorists.  Therefore, we conclude that, at least initially, the encounter between Steinert and the Defendants was consensual.  See, e.g., United States v. Ortiz-Monroy, 332 F.3d 525, 528 (8th Cir. 2003)(holding that the encounter between the officer and the defendant, where the defendant had been parked at a rest area, was consensual); United States v. Perez-Sosa, 164 F.3d 1082, 1084 (8th Cir. 1998)(holding that where the officer had attempted to stop the defendant's vehicle by activating his lights, the encounter was consensual,

because the defendant did not acquiesce in the show of authority, but rather, he chose voluntarily to stop the vehicle to refuel).

Furthermore, the Defendants were not seized, for the purposes of the Fourth Amendment, when Steinert requested their identification. "'[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.'" Hiibel v. Sixth Judicial Dist. Court of Nevada, 542 U.S. 177, 124 S.Ct. 2451, 2458 (2002), quoting I.N.S. v. Delgado, 466 U.S. 210, 216 (1984). "[E]ven when law enforcement officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individuals' identification; and request consent to search." Muehler v. Mena, --- U.S. ---, 125 S.Ct. 1465, 1471 (2005); United States v. Scott, 2005 WL 1241592 at *2 (8th Cir., May 26, 2005), quoting United States v. Drayton, 536 U.S. 194, 201 (2002)(same); see also, United States v. Ortiz-Monroy, supra at 528; United States v. Perez-Sosa, supra at 1084 ("[The defendant] was not seized when the trooper approached the van, asked to see identification, and posed a few questions.").

Once the Defendants were unable to produce identification, even after they had made attempts to locate the same in the passenger compartment of the vehicle,

Steinert's suspicions were aroused.  In addition, Steinert did not believe that the individuals had made valid attempts to locate their identification, because they appeared to be more concerned with where Steinert was looking, and they did not examine the usual places where identifications are kept -- namely, the glove compartment, and the center console.  Steinert also found it suspicious that there was no luggage in the vehicle, despite the fact that the men stated that they had driven from Washington.

At that point, during the stop, Steinert decided to separate the individuals, by asking Montano to be seated in the truck, while Jimenez was placed in the back of the squad car, following a pat frisk.  Steinert testified that, when he did so, the individuals were not free to leave, and it is undisputed that they had not been read a <u>Miranda</u> warning.  The Defendants contend that the continued questioning of them, after that point in time, constituted custodial interrogation, which was in violation of their <u>Miranda</u> rights.  We disagree, and we find that, at most, Steinert transformed what was a consensual encounter, into a <u>Terry</u> stop.

"Reasonable suspicion requires '"a particularized and objective basis" for suspecting the person stopped of criminal activity,'" and is not as demanding a standard as that of probable cause.  <u>Thomas v. Dickel</u>, 213 F.3d 1023, 1025 (8th Cir.

2000), quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996), quoting, in turn,

<u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981).  Notably, "[a] reasonable suspicion

may be justified even if there are innocent explanations for a defendant's behavior

when the circumstances are considered in the totality."   <u>United States v. Tuley</u>, 161

F.3d 513, 515 (8th Cir. 1998), citing <u>United States v. Bloomfield</u>, 40 F.3d 910, 918 (8th

Cir. 1994)[en banc], cert. denied, 514 U.S. 1113 (1995).  Further, a <u>Terry</u> stop is an

investigative stop, which permits "an officer with reasonable suspicion to detain an

individual to ask 'a moderate number of questions to determine his identity and to try

to obtain information confirming or dispelling the officer's suspicions.'"   <u>United States</u>

<u>v. Rodriguez-Arreola</u>, 270 F.3d 611, 616 (8th Cir. 2001), quoting <u>Berkemer v.</u>

<u>McCarty</u>, 468 U.S. 420, 439 (1984).

     "<u>Miranda</u> warnings are not necessary during ordinary <u>Terry</u> stops because they

generally do not amount to custodial interrogation."   <u>United States v. Johnson</u>, 64 F.3d

1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996), citing <u>Berkemer v.</u>

<u>McCarty</u>, supra at 439-40; see also, <u>United States v. McGauley</u>, 786 F.2d 888, 890 (8th

Cir. 1986)("No <u>Miranda</u> warning is necessary for persons detained for a <u>Terry</u> stop.");

<u>United States v. Pelayo-Ruelas</u>, 345 F.3d 589, 592 (8th Cir. 2003).  As the Court

explained, in <u>United States v. Pelayo-Ruelas</u>, supra at 592, quoting <u>Berkemer v. McCarty</u>, supra at 439-40:

> The [Terry] stop and inquiry must be reasonably related in scope to the justification for their initiation.  Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.  But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.  The comparatively non-threatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda.  The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purpose of Miranda.

We accept, as did the Court in <u>Pelayo-Ruelas</u>, that "[o]ne is not free to leave a Terry stop until the completion of a reasonably brief investigation, which may include limited questioning[,] * * * [b]ut most Terry stops do not trigger the detainee's Miranda rights."  <u>Id.</u>

As we have noted, the encounter did not begin as a traffic stop, or a <u>Terry</u> stop, and Steinert did not activate his lights as a show of authority.  Furthermore, Steinert was the only officer present at the scene, while the majority, if not all, of the questions were being asked, which counsels against a finding that the atmosphere was police-

dominated.  Finally, neither of the Defendants ever indicated that they were unwilling to answer Steinert's questions, and he did not employ the use of any strong arm tactics, or deceptive stratagems.  As the Defendants note, some of the other <u>Griffin</u> factors may weigh against a finding that the Defendants were not in custody -- namely, they were not informed that the questioning was voluntary, or told that they were not under arrest, their freedom of movement was restrained when they were placed in separate vehicles, they had not initiated contact with Steinert, and they were arrested after the questioning had occurred.  However, we find that those factors are insufficient to support a finding that the Defendants were in custody, when viewed in the totality of the circumstances.  Rather, as we have stated, we conclude that the stop stayed within the bounds of a <u>Terry</u> stop, which was supported by reasonable suspicion, based on the failure of the Defendants to produce valid identification, and on Steinert's belief that they were not making any direct attempts to locate identification, as well as the absence of luggage.

We further find that the questioning, at the scene of the vehicle stop, that is here being challenged, was wholly within the scope of a <u>Terry</u> stop.  Steinert had reason to believe that the Defendants were providing him with false information, including their names, and the questions that he asked were within the scope of the investigation into

- 24 -

his suspicions.  See, <u>United States v. Rodriguez-Arreola</u>, supra at 617 (after one occupant of a car, detained in a traffic stop, informed an officer that he was not legally present in the United States, the "[officer] had reasonable suspicion to inquire into [the defendant's] alienage," and the officer "acted within the proper scope of th[at] suspicion by asking [the defendant] whether he was a legal alien and had a green card," and the "evidence is admissible even though [the defendant] had not yet received a Miranda warning.").  As a result, a <u>Miranda</u> warning was unnecessary, and the lack thereof does not render the answers to the questions inadmissible.  See, <u>United States v. Johnson</u>, supra at 1126 ("<u>Miranda</u> warnings are not necessary during ordinary <u>Terry</u> stops because they generally do not amount to custodial interrogation."), citing <u>Berkemer v. McCarty</u>, supra at 439-40; <u>United States v. McGauley</u>, supra at 890 ("No <u>Miranda</u> warning is necessary for persons detained for a <u>Terry</u> stop."); <u>United States v. Pelayo-Ruelas</u>, 345 F.3d 589, 592 (8th Cir. 2003).  Accordingly, we recommend that the Defendants' Motions to Suppress Statements, Admissions and Answers be denied, insofar as they relate to the statements that were made, during the stop of his vehicle.

b.    <u>The Defendants' Statements to Sharp</u>.   The sole question raised by the Defendants, concerning their statements to Sharp, is whether the advice of rights was sufficient.   Sharp testified that he administered <u>Miranda</u> warnings to the Defendants from memory, and that he did not have any forms with him, because he had traveled from his home to conduct the interviews.   Sharp further testified that he has administered the <u>Miranda</u> warning numerous times, and he had no concern that he missed any of the rights.   However, Sharp was not asked, by either the Defendants or the Government, to recite the warnings that he administered to the Defendants, prior to their interrogations.

1)    <u>Standard of Review</u>.    "Miranda requires that before a custodial interrogation a suspect must be informed, among other things, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him before any questioning if he desires."   <u>United States v. Caldwell</u>, 954 F.2d 496, 501 (8th Cir. 1992), citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).   In <u>Caldwell</u>, the Court went on to explain the standard, for determining the adequacy of a <u>Miranda</u> warning, as follows:

> The Supreme Court "has never indicated that the 'rigidity'
> of Miranda extends to the precise formulation of the
> warnings given a criminal defendant." [California v.]

- 26 -

> Prysock, 453 U.S. [355] at 359 [(1981)].  "Miranda itself indicate[s] that no talismanic incantation [is] required to satisfy its strictures."  Id.  Prysock recognized that Miranda "announced procedural safeguards including 'the now familiar Miranda warnings * * * **or their equivalent**.'"  Prysock, 453 U.S. at 360 * * * (quoting [Rhode Island v.] Innis, 466 U.S. [291] at 297 [(1980)] * * * (emphasis supplied in Prysock).  Duckworth makes clear that "[r]eviewing courts * * * need not examine Miranda warnings as if construing a will or defining the terms of an easement." [Duckworth v. Eagan, 492 U.S. 195, 203 (1989)].  "The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by Miranda.'"

Id. at 502; see also, Missouri v. Seibert, --- U.S. ---, 124 S.Ct. 2601, 2610 (2004).

"Accordingly, 'to reduce the risk of a coerced confession and to implement the Self-Incrimination Clause,' Chavez v. Martinez, 538 U.S. 760, 790, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003)(Kennedy, J., concurring in part and dissenting in part), [the Supreme Court] in Miranda concluded that 'the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.'"  Missouri v. Seibert, supra at 2608, quoting Miranda v. Arizona, supra at 467.

"[T]he burden of showing admissibility [of a defendant's statement] rests, of course, on the prosecution."  Id. at 2608, n. 1, citing Brown v. Illinois, 422 U.S. 590, 604 (1975).  "The prosecution bears the burden of proving, at least by a

preponderance of the evidence, the Miranda waiver, Colorado v. Connelly, 479 U.S. 157, 169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and the voluntariness of the confession, Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)." Id.

2)  Legal Analysis.  In seeking to suppress their respective statements to Sharp, the Defendants rely heavily on the decisions in Moll v. United States, 413 F.2d 1233 (5th Cir. 1969), and United States v. Klein, 592 F.2d 909 (5th Cir. 1979).  In Moll, an officer testified that he had read to the defendant a card concerning his rights.  The Court suppressed the statement, and held that such evidence did "not demonstrate that a constitutionally adequate warning was given," and that "[t]he government's burden [of proving that proper warnings were given] may not be met by presumptions or inferences that when police officers read to an accused from a card they are reading Miranda warnings or that what is read, without revelation of its contents, meets constitutional standards." Id. at 1237-38.  Similarly, in Klein, the Agent testified that he had read the defendant his rights from a card, but he did not testify as to the contents of the card.  In determining that the statement did not need to be suppressed, the Court noted that the Agent "acknowledged that the card contained the standard Miranda warnings, and that the defendant admitted that he was

advised of his rights.   Id. at 914; see also, Gonzalez v. Wilmot, 1986 WL 8854 (S.D.N.Y., August 1, 1986)(holding that an officer's testimony, that he read the defendant a Miranda warning, from an arrest report, was sufficient).

Subsequent cases have further developed the factual spectrum, within which the adequacy of a Miranda warning can be tested.   In United States v. Gilmer, 793 F. Supp. 1545, 1555 (D. Colo. 1992), an officer "testified that he 'advised [the defendant] of his Miranda rights,'" but he "did not explain his understanding of the Miranda rights, nor did he recite the Miranda advisement that was given to [the] defendant," and two other officers testified that the defendant had been "Mirandized," but they either did not testify as to what was said, or could not recall.   The Court stated that "[g]eneral, conclusory statements such as those recited above are not sufficient to discharge the Government's burden of proving that Miranda warnings were given," and "only with specific testimony can the court decide whether the officers conveyed **all** of the proper warnings and whether the statement in question was admissible."   Id. at 1555-56 [emphasis in original].

In Ex parte Price, 725 So.2d 1063 (Ala. 1998), an officer testified that the defendant "had been advised 'of his rights,'" and that the advice of rights would be reflected on the audiotape of the interview, which was apparently never introduced at

Trial, or considered by the Court.  Additional testimony demonstrated that the rights

had been read from a form or card, but the officer did not read from that document

at the Hearing.  At Trial, the Government asked the officer whether certain rights had

been included, but omitted that if the defendant could not afford an attorney, one

would be provided for him.  The officer testified that all of the rights that the

Government had recited had been included in the warning, but he did not state that any

additional rights had been included, other than those mentioned.  Id. at 1069-70.  The

Court, in Price, acknowledged that officers, and the public, frequently used the word

"Mirandize" as a "shorthand summary of all of the rights articulated in Miranda v.

Arizona."  Id. at 1070.  However, the Court went on to state that "the fact that

knowledge concerning the rights established in Miranda has become widespread does

not necessarily establish that a court may conclude that law enforcement authorities

properly advised a suspect of his rights simply because an officer testifies that the

suspect was advised of his 'Miranda rights' from a form."  Id. at 1071.  Rather, "the

State must spell out with clarity and precision the specific Miranda warnings the police

gave to the defendant, because 'the general question of whether the Miranda warnings

were given does not adequately establish whether the warnings were **properly** given

and understood by the defendant.'"  Id., quoting Ex parte Johnson, 620 So.2d 709,

711 (Ala. 1993)[emphasis in original].   Furthermore, "[a] court cannot fill in an

evidentiary gap with supposition or a presumption concerning a witness's knowledge."

Id.

Other Courts have refused to create a bright-line test for the sufficiency of a

Miranda warning simply because the contents of the warning given were not

specifically recited at the Suppression Hearing.   See, e.g., United States v. Muniz, 93

Fed.Appx. 208, 2004 WL 582153 (10th Cir., March 24, 2004).   Although we have

closely canvassed the pertinent cases, two decisions -- which were not cited by any

of the parties -- particularly warrant our consideration.   In United States v. Jones, 275

F.3d 673, 679 (8th Cir. 2001), an officer testified that he had informed the defendant

of his Miranda rights, at the time of his booking, by reciting them from memory.   The

Defendant denied that he was informed of his Miranda rights until after he had made

the incriminating statements to the officer.   Nothing more is presented, in the Court's

opinion, about the adequacy of the Miranda advisory, as the Court concluded that the

issue presented rested solely on a credibility determination that was made by the

District Court, and upheld that determination of credibility.   Resort to the appellate

briefs, however, reflect that the interrogating officer did provide the defendant, there,

a full Miranda advisory, as the officer recited the advisory in his testimony at the

Suppression Hearing.  See, <u>United States v. Jones, Brief for Plaintiff-Appellee</u>, 2000 WL 33977317 (2000).  Accordingly, the issue confronting us was not presented to the Courts, in <u>Jones</u>.

In <u>United States v. Lerma</u>, 2002 WL 31548076 at *2 (D. Minn., November 12, 2002), however, the precise issue was presented for the Court's resolution.  There, a Magistrate Judge recommended the grant of the defendant's Motion to Suppress his statements to an interrogating officer, as "[t]he only evidence regarding [a] Miranda warning [wa]s [the officer's] testimony that he delivered it from memory."  Upon the Government's objection, the District Court sustained the objection, reasoning as follows:

> The Court finds [the absence of testimony as to the contents of the Miranda warning] inadequate to call the warning's sufficiency into question.  The record demonstrates that [the defendant] was given the Miranda warnings twice: once by [the interrogating officer] at the June 4 interview, and once upon her arrest the previous day.  In the Court's view, the record clearly demonstrates that [the defendant] was advised of her Miranda rights.  This, combined with the harmlessness of [the interrogating officer's] statement and in view of the totality of the circumstances, convinces this Court that [the defendant's] June 4 statements were voluntary.  Accordingly the government's objections will be sustained.

<u>Id.</u>

- 32 -

Here, of course, there was a single Miranda warning given to each of the Defendants. Accordingly, we find Lerma to be inapposite.

In light of the decisions which we have just discussed, we find that Sharp's testimony is insufficient to meet the Government's burden of proving that the Defendants were adequately advised of their Miranda rights, and consequently, that they voluntarily, knowingly, and intelligently waived those rights. Unlike United States v. Klein, or Gonzalez v. Wilmot, we are not presented with an admission by the Defendants that they received a Miranda warning, nor did Sharp read from a form, or a card, upon which the Miranda rights were printed. To the contrary, Sharp specifically testified that he read the rights from memory, and not from a form, or a card. Additionally, no written waivers, or other evidence that the Defendants were given a full Miranda warning was adduced at the Hearing and, although Sharp stated that he has administered the Miranda warning on numerous past occasions, and that he had no concern that he missed any of the rights, he never related what rights he recited by memory.

A Miranda advisory continues to have significance as reflected in the Supreme Court's recent decision in Missouri v. Seibert, supra, where the Court concluded that the provision of an adequate, though belated, Miranda warning warranted the exclusion

of the statement obtained in its absence.  Similarly, our Court of Appeals' decision, in <u>United States v. Caldwell</u>, supra, could be readily eluded simply by having interrogating officers testify, without more, that they provided an adequate <u>Miranda</u> warning.  Where, however, rights as significant as those reflected in <u>Miranda</u>  can be waived, those rights should be meaningfully detailed in the Record so that the Court can determine, on a principled basis, whether the waiver was both knowing and voluntary.

In recommending the suppression of the Defendants' statements to Sharp, we imply no lack of credibility in Sharp's testimony, as the issue presented is not one of believability.  We have no doubt that Sharp provided the Defendants with what he regarded as a <u>Miranda</u> advisory; we simply do not know what that advisory was, and whether it was sufficiently complete to alert each Defendant to the rights they were surrendering.   Nor are we suggesting that interrogating officers must advise a defendant of his or her <u>Miranda</u> rights from a standardized card, or as evidenced by some writing signed by the defendant.  We simply conclude that an interrogating officer, who assertedly knows the <u>Miranda</u> rights by heart,  should be obligated to

recite the same warning he provided a defendant, by memory, so as to carry the Government's burden as to the adequacy of the warning given.[14]

Nor do we suggest that, in every instance, an officer must recite verbatim the warning that he or she administered to a defendant, prior to taking a statement, but such testimony is particularly warranted where, as here, the officer provided the Miranda warning from memory. See, United States v. Gilmer, supra; see also, United State v. Valdez-Garcia, 2003 WL 21135705 (D. Neb., May 14, 2003)(holding that the Government did not meet its burden of proving a valid waiver of Miranda rights, where the officer testified that he had read a standard Miranda advisement, from a card, but where neither the card nor a signed advisement form was produced, and where the

---

[14]We understand the Government to argue that, if the Defendants thought the Miranda warning was somehow inadequate, they had the opportunity to question Sharp on that subject so as to impeach the sufficiency of his advisory. Such an argument, however, overlooks the Government's obligation to carry its own burden of proof. We do not here deal with a minor technicality which we exalt into a constitutional defect. Whether a Miranda advisory is adequate is to be determined on the Record submitted, and not on a Record that could have been if someone would have made the inquiry. Here, we have no means of knowing what rights were explained to the Defendants, nor any means to ascertain whether those rights were consistent with the standard-issue Miranda card, or were otherwise sufficient, in view of the Defendants' past criminal history -- which is also not before us in this Record -- to intelligibly inform them of the rights they were being asked to surrender. Nor can we be faulted for dissecting the rights given, as if they constituted a will or an easement, for we simply do not know what rights were recited.

officer omitted one of the rights, in response to questioning about what words he had used).   In sum, we recommend that the Defendants' Motions to Suppress the statements they made to Sharp be granted.[15]

      B.    The Defendants' Motions to Suppress Evidence Obtained by Search and Seizure.

Jimenez contends that the inventory search of the vehicle was unlawful, because there was no justification to seize the truck, and because the search was not conducted in accordance with standardized criteria, or an official policy.   Although Montano has not submitted additional arguments on, or clarified the basis for his Motion to Suppress Evidence Obtained by Search and Seizure,[16] we undertake the same analysis as with Jimenez's Motion.

---

[15]We reiterate that the Defendants did not challenge the voluntariness of their statements to Sharp and, except insofar as the <u>Miranda</u> warning, and waiver, was inadequate, there is nothing in the Record to suggest that the Defendants' statements were coerced.

[16]Montano does argue that the evidence, including the weapon and the drugs, should be suppressed as "fruit of the poisonous tree," as a result of his contention that his statements were unlawfully obtained.  See, <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).  The items were discovered in the vehicle, subsequent to the statements that Montano made at the scene of the stop, which we have found need not be suppressed, and prior to the statements made to Sharp.  Therefore, there is no "taint" that would justify the suppression of the evidence found during the search of the vehicle.

1.      <u>Standard of Review</u>.  As the Supreme Court explained, in <u>South Dakota v. Opperman</u>, 428 U.S. 364, 368-69 (1976), "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions,' <u>Cady v. Dombrowski</u>, [413 U.S. 433, 441 (1973)], automobiles are frequently taken into police custody," and when they are, the police "generally follow a routine practice of securing and inventorying the automobiles' contents."   These inventorying policies were developed to protect "the owner's property while it remains in police custody," to protect "the police against claims or disputes over lost or stolen property," and to protect "the police from potential danger."   <u>Id.</u> at 369; see also, <u>United States v. Mayfield</u>, 161 F.3d 1143 (8th Cir. 1998).   The Supreme Court has determined "that inventories pursuant to standard police procedures are reasonable" under the Fourth Amendment.  <u>South Dakota v. Opperman</u>, supra at 372; see also, <u>Colorado v. Bertine</u>, 479 U.S. 367, 374 (1987), <u>United States v. Mayfield</u>, supra at 1145, <u>United States v. Hartje</u>, 251 F.3d 771, 775-76 (8th Cir. 2001).

Additionally, a search incident to a valid arrest is constitutional.  See, e.g., <u>New York v. Belton</u>, 453 U.S. 454, 461 (1981); <u>Chimel v. California</u>, 395 U.S. 752, 762 (1969); <u>United States v. Klein</u>, 13 F.3d 1182, 1184 (8th Cir. 1994), cert. denied, 512 U.S. 1226 (1994).  "A custodial arrest of a suspect based on probable cause is a

reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."  Id., quoting United States v. Robinson, 414 U.S. 218, 235 (1973); see also, Curd v. City Court of Judsonia, Ark., 141 F.3d 839, 842 (8th Cir. 1998)("Warrantless searches incident to a custodial arrest are 'justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained.'"), quoting United States v. Edwards, 415 U.S. 800, 802-03 (1974).

The Supreme Court, in New York v. Belton, supra at 460-61, held as follows:

> [W]e hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.  It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach.  Such a container may, of course, be searched whether it is open or closed.

Id. (footnotes and citations omitted).

Furthermore, in the context of automobiles, our Court of Appeals has reiterated:

> As long as law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception.  See Pennsylvania v. Labron, [518 U.S. 938, 940] (1996); [United States v.] Martinez, 78 F.3d [399] at 401 [(8th Cir. 1996)].  Probable cause exists when,

> given the totality of the circumstances, a reasonable person
> could believe there is a fair probability that contraband or
> evidence of a crime would be found in a particular place.
> See Illinois v. Gates, [462 U.S. 213, 238] (1983).

United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

Of course, "[p]robable cause demands not that an officer be 'sure' or 'certain' but only that the facts available to a reasonably cautious man would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.'"

Id.

2.      Legal Analysis.   Jimenez contends that Steinert had no reason to arrest and detain him, and therefore, Steinert should have released the truck to Jimenez. We disagree.

Steinert testified that, since neither of the men had drivers' licenses, and there was no ownership of the vehicle documentation, or insurance coverage cards, he believed that he was being provided with false information, and false names.  Those factors formulated the bases for Steinert's ultimate decision to arrest the Defendants. When a police officer has probable cause to believe that a person has committed a felony, a warrantless arrest is permitted.  United States v. Travis, 993 F.2d 1316, 1323 (8th Cir. 1993), citing United States v. Watson, 423 U.S. 411 (1976).  "Determining probable cause to arrest requires the court to focus on the moment the arrest was

made and to ask whether 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" United States v. Taylor, 106 F.3d 801, 803 (8th Cir. 1997), quoting Beck v. Ohio, 379 U.S. 89, 91 (1964); see also, Kiser v. Huron, 219 F.3d 814, 816 (8th Cir. 2000)("Furthermore, '[a]n officer has probable cause to make a warrantless arrest when facts known to the officer are sufficient to make a reasonably prudent officer believe that the suspect is committing or has committed an offense.'"), quoting Olinger v. Larson, 134 F.3d 1362, 1366 (8th Cir. 1998); Tokar v. Bowersox, 198 F.3d 1039, 1046-47 (8th Cir. 1999)("The existence of probable cause in fact to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy information, were sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense.").

"'The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances.'" Tokar v. Bowersox, supra at 1047, quoting United States v. Everroad, 704 F.2d 403, 406 (8th Cir. 1983). We keep in mind, however, that

"[p]robable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity."  Id.

Here, neither of the Defendants had been able to produce valid identification, or drivers' licenses; the number of the driver's license, which had been provided by Montano, was registered to a person other than Gonzalez, which was the name on the driver's license; there was no California driver's license for Alfredo Gonzalez; Jimenez had a citation in a different name than the one he had provided; and Jimenez's name came back not on file, despite his assertion that he had received traffic tickets in the past, and that they should be on his record.  Additionally, Steinert testified that the Defendants did not appear to be actively looking for their identification in the truck, but rather, they were more concerned with where Steinert was looking, and he also found the absence of luggage, and the inconsistent statements of the Defendants, to be suspicious.  Based on a totality of the circumstances, we find that Steinert had probable cause to arrest the Defendants.

Jimenez maintains that the police failed to follow standard police procedures, in conducting the inventory search, and he contends that such a failure constitutes evidence that the search was a mere pretext, or "a ruse for general rummaging in order to discover incriminating evidence."  Florida v. Wells, 495 U.S. 1, 4 (1990); see also,

United States v. Loaiza-Marin, 832 F.2d 867, 869 (8th Cir. 1987). Courts have concluded that, compliance with the standard police procedures "tends to ensure the intrusion is limited to carrying out the government's caretaking function," but at the same time, they have cautioned reviewing Courts that "[t]his does not mean that inventory searches are always unreasonable when standard procedures are not followed." United States v. Mayfield, supra at 1145; see also, Whren v. United States, 517 U.S. 806, 816 (1996)("[I]t is a long leap from the proposition that following regular procedures is some evidence of lack of pretext to the proposition that failure to follow regular procedures proves (or is an operational substitute for) pretext."); United States v. Woolbright, 831 F.2d 1390, 1394 (8th Cir. 1987).

Further, in considering the reasonableness of an inventory search, the subjective intent of the executing officer does not invalidate an otherwise valid inventory search. United States v. Garner, 181 F.3d 998, 991 (8th Cir. 1999); see also United States v. Lewis, 3 F.3d 252, 254 (8th Cir. 1993), United States v. Marshall, 986 F.2d 1171, 1176 (8th Cir. 1993). Thus, even if, at the time that they conducted an otherwise valid inventory search, the officers suspected that they might find evidence of criminal activity, the search would not be unreasonable. See, United States v. Garner, supra at 992. In determining the reasonableness of an inventory search, Courts are to

consider the totality of the circumstances.   See, United States v. Mayfield, supra at 1145.

Jimenez contends that the "policy," which was submitted as Government Exhibit 1, only contains directions as to how to complete the form, as opposed to standardized criteria for conducting an inventory search, and therefore, Jimenez urges us to conclude that the inventory search was improper, and that the evidence found inside of the truck should be suppressed.   Here, Steinert testified that Government Exhibit 1, is a "Custody Report," which instructs officers how to fill out the form, as well as under what circumstances the form should be completed.   Steinert further testified that the policy is to complete the inventory form, whenever a vehicle is towed, and that a vehicle is towed, following the custodial arrest of the occupant(s). Furthermore, the officers were unable to release the vehicle to either of the occupants, since neither of them had a valid driver's license, nor could they prove that they were licensed drivers.   See, United States v. Stephens, 350 F.3d 778, 780 (8th Cir. 2003)("Absent a valid driver's license, [the defendant] could not legally operate the vehicle, thus making it appropriate for police to take immediate possession and secure the vehicle.").   As a result, the officers decided to conduct a full inventory search of

the vehicle, and Steinert stated that the inventory search was performed in accordance with the policy.

This is not a case where the officers "did not mention any standard procedures whatsoever," or were "unable to state even when inventory searches are to be conducted," see United States v. Marshall, supra at 1175, nor is this a case where the officers did not adhere to the inventory search policy. See, United States v. Rowland, 341 F.3d 774, 782 (8th Cir. 2003). We find that the officers properly conducted an inventory search of the vehicle, in accordance with a standardized policy to tow the vehicle, pursuant to the custodial arrests of the occupants, and in the absence of a licensed driver. See, United States v. Petty, 367 F.3d 1009, 1012 (8th Cir. 2004)(rejecting the defendant's argument that the inventory search was invalid in the absence of a standardized impoundment policy, where the Court found, based on the officer's testimony, that it was "standard police policy to tow a vehicle when there is no one available to drive it"); see also, United States v. Lowe, 9 F.3d 43 (8th Cir. 1993).

Furthermore, roadside searches, or searches conducted at the scene of the stop, have routinely been upheld as inventory searches. See, United States v. Stephens, supra at 780 (upholding search of vehicle after a traffic stop as both an inventory

search, and a search incident to arrest); United States v. Mayfield, supra at 1144-45 (upholding an inventory search of a vehicle, which began at the scene of a traffic stop); United States v. Wallace, 102 F.3d 346, 349 (8th Cir. 1996), citing United States v. Como, 53 F.3d 87, 92 (5th Cir. 1995)("Police may lawfully conduct [inventory] searches while the vehicle is still on the highway awaiting towing."), cert. denied, 516 U.S. 1049 (1996); United States v. Mays, 982 F.2d 319, 322 (8th Cir. 1993)("It was entirely reasonable for the officers to initiate an inventory search of the vehicle at the arrest site.").

In addition, the search of the truck was lawful, as a search incident to the arrests of the Defendants, which we have previously found to be lawful as well. Even if the Defendants were no longer seated in the vehicle, at the time of their arrest, they are still considered to be occupants of the vehicle. See, United States v. Snook, 88 F.3d 605, 608 (8th Cir. 1996)("The fact that Snook had just stepped out of his vehicle as the officer arrived and before his arrest does not alter his status as an 'occupant' of the vehicle."); United States v. Riedesel, 987 F.2d 1383, 1388-89 (8th Cir. 1993)(holding that, where the individual had driven away from the initial encounter, and was arrested as he was walking from a gas station toward his car, a search of the vehicle incident to arrest was valid); United States v. McCrady, 774 F.2d 868, 871-72 (8th Cir.

1985)(the search of the passenger compartment of the defendant's car, subsequent to his arrest and placement in the police car, was valid as incident to his arrest).

Therefore, the officers were entitled to search the interior of the vehicle, in which the Defendants were, or had been sitting.  Pursuant to that exception, the officers could also extend the search to the removal of the stereo, which was not securely fastened to the dash, and to the can of Rave, which had a false bottom.  See, United States v. Belton, supra at 460-61, and n. 4 (allowing the search of the passenger compartment of a vehicle, including any containers, whether open or closed); United States v. Poggemiller, 375 F.3d 686, 688 (8th Cir. 2004)(a search of a trap-door compartment behind the armrest in the middle of the back seat was permissible as a search incident to arrest), citing United States v. Caldwell, 97 F.3d 1063, 1067 (8th Cir. 1996).  Finally, once the officers had found the gun, and the methamphetamine, they had probable cause to believe that additional evidence of a crime may be located

elsewhere in the vehicle.[17]   Accordingly, we recommend that the Defendants' Motions to Suppress evidence located during the initial search of the vehicle be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Defendants' Motions to Suppress Statements, Admissions and Answers [Docket Nos. 24 and 51] be granted, in part, as more fully discussed in the text of this Recommendation.

2.     That the Defendants' Motions to Suppress Evidence Obtained by Search and Seizure [Docket Nos. 25 and 50] be denied.

Dated: June 6, 2005            s/Raymond L. Erickson
                               Raymond L. Erickson
                               UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and

---

[17]At the Hearing, there was some question as to whether the canine had "alerted to," or merely "indicated" certain areas on the vehicle.  Since we find that the officers had probable cause to search the vehicle, based on their discovery of the gun, and the methamphetamine, which occurred prior to the canine sniff, we need not further address that matter.

Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than June 23, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than June 23, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.